1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Salt    River    Project    Agricultural          No. CV-08-08028-PCT-JAT
    Improvement   and   Power   District,   a
10  municipal    corporation    and    political
    subdivision   of   the   State   of   Arizona,
11  Headwaters    Resources,   Inc.,   a   Utah      **ORDER**
    corporation,

12                         Plaintiffs,

13  v.

14
    Reynold R. Lee, Casey Watchman, Woody
15  Lee, Peterson Yazzie, Evelyn Meadows,
    Honorable Herb Yazzie, Honorable Louise
16  G.   Grant,   Honorable   Eleanor   Shirley,
    Leonard Thinn and Sarah Gonnie,
17
                          Defendants.
18

19

20         Pending before the Court are three motions by the parties.  First, Plaintiffs have

21  filed a Motion for Summary Judgment (Doc. 162) and a Statement of Facts in Support of

22  the Motion for Summary Judgment (Doc. 163).  Defendants have filed a Response

23  ("Response") to this motion (Doc. 165) and a Response to the Statement of Facts in

24  Support of the Motion for Summary Judgment (Doc. 166).  Plaintiffs in turn have filed

25  their Reply (Doc. 175).

26         Defendants have also filed a Cross Motion for Summary Judgment (Doc. 167) and

27  three supporting documents.  These supporting documents include: Memorandum in

28  Support of Cross Motion for Summary Judgment (Doc. 165), Statement of Facts in

Support of Cross Motion for Summary Judgment (Doc. 166), and Declaration in Support of the Cross Motion for Summary Judgment (Doc. 168).  Plaintiffs have filed a Response to the Cross Motion for Summary Judgment (Doc. 175) and a Response to the Statement of Facts in Support of Defendants' Cross Motion for Summary Judgment (Doc. 176). Defendants subsequently filed their Reply (Doc. 181).

Finally, Defendants have filed a Motion to Dismiss Parties (Doc. 169).  Plaintiffs have filed a Response to this motion (Doc. 173), and Defendants have filed a Reply (Doc. 178).  Plaintiffs have also filed a Notice of Supplemental Citation of Authority in support of their Response.  (Doc. 184).

## I.    FACTUAL BACKGROUND

In 1969, Plaintiff Salt River Project Agricultural Improvement and Power District ("SRP") and other energy utilities entered into a lease with the Navajo Nation to construct and operate an electrical power plant called the Navajo Generating Station ("NGS"), located near Page, Arizona, on the Navajo Reservation.  SRP contracts with Plaintiff Headwaters Resources ("Headwaters") at NGS.  The lease SRP signed with the Navajo Nation (the "1969 Lease") allows SRP to operate NGS on Navajo Nation land. The 1969 Lease was signed by SRP among other utilities and Raymond Nakai, Chairman of the Navajo Tribal Council.  (Doc. 5-3 Ex. 1 at 36).  At the same time SRP entered into the 1969 Lease, the United States Secretary of the Interior granted SRP and the other utilities certain easements and rights-of-way (the "§ 323 Grant").  The Secretary entered into the § 323 Grant to induce SRP and the others to proceed with the development of NGS.

The 1969 Lease contains two clauses pertinent to this action.  In section 16, "[t]he Tribe covenants that, other than as expressly set out in this Lease, it will not directly or indirectly regulate or attempt to regulate the Lessees in the construction, maintenance or operation of [NGS]" ("non-regulation clause").  (Doc. 5-3 Ex. 1 at 9).  In section 18, SRP agreed to give preference in employment to local Navajos ("employment preference clause").  (*Id*. at 10-11).

In October 1985, approximately sixteen years after the 1969 Lease was signed and ten years after NGS became fully operational, the Navajo Nation enacted the Navajo Preference in Employment Act ("NPEA").  The impetus for the NPEA was the Navajo Tribal Council's dissatisfaction with the lack of progress made over the years in employing and training Navajo people by companies doing business within the Navajo Nation.  (Doc. 168-1 Ex. 1 at 4).  The NPEA was passed to affect major private companies, which had originally committed themselves by lease provisions to give Navajo preference in employment.  (*Id*.)  SRP was one of these companies.  (*Id*. at 13).  The Navajo Tribal Council found that preference obligations—such as the one in the 1969 Lease—and existing Navajo law on preference were too vague, rendering them effectively unenforceable.  (*Id*. at 5).  The NPEA was unilaterally created to resolve compliance problems with these preference obligations, and establishes various rights for Navajo employees and obligations for private non-Navajo employers.  (*Id*. at 6).

The NPEA is enforced throughout the Navajo reservation by the Office of Navajo Labor Relations ("ONLR") and the Navajo Nation Labor Commission ("NNLC").  The ONLR was created by the Navajo Tribal council and has the responsibility to examine claims made under the NPEA and, if warranted, file complaints against offenders of the NPEA on behalf of individual Navajos.  (*Id*. at 9).  The NNLC conducts the hearings on NPEA complaints filed by the ONLR and issues written decisions following those proceedings.  (*Id*. at 7).

## II.   PROCEDURAL BACKGROUND

These motions come before the Court following a long litigation process.  This case originated with two separate employee complaints filed by Leonard Thinn and Sarah Gonnie, both members of the Navajo Nation, who worked at NGS.

On December 2, 2004, Mr. Thinn, a former employee of SRP, filed a charge with the ONLR, alleging that he had been terminated by SRP without just cause in violation of the NPEA.  The ONLR determined there was probable cause to believe SRP had violated the NPEA and issued a Notice of Right to Sue.  Mr. Thinn then filed a complaint against

SRP with the NNLC on November 15, 2005.  SRP filed a motion to dismiss the complaint for lack of jurisdiction which the NNLC granted.  Mr. Thinn filed a notice of appeal on May 12, 2006.

On March 2, 2005, Ms. Gonnie, a former employee of Headwaters, filed a charge with the ONLR alleging that she had been terminated by Headwaters for unreasonable and insufficient reasons.  On September 16, 2005, the ONLR issued Ms. Gonnie a Right to Sue letter.  On September 22, 2005, Ms. Gonnie filed a complaint with the NNLC against Headwaters.  On April 28, 2006, the NNLC granted Headwaters's motion to dismiss for lack of jurisdiction.  Ms. Gonnie appealed on May 12, 2006.

The Navajo Nation Supreme Court consolidated the Thinn and Gonnie appeals and reversed the judgments of the NNLC.  The Navajo Nation Supreme Court ruled that the NPEA applies to SRP and Headwaters and that the NNLC has jurisdiction to enforce the NPEA against them.  The Navajo Nation Supreme Court remanded to the NNLC for further proceedings on the merits of the Thinn and Gonnie claims.

The NNLC set the two cases for hearings in April 2008.  SRP and Headwaters filed motions with the NNLC to stay the Thinn and Gonnie hearings based on SRP's request to have the Secretary of the Interior (the "Secretary") address the jurisdictional issue.  On February 27, 2008, the NNLC denied the motions to stay.

On February 29, 2008, Plaintiffs filed their Complaint in this Court (Doc. 1) against Defendants.  Defendants are Navajo tribal officials in their official capacity as representatives of the Navajo Nation.  Subsequently, the NNLC stayed the Thinn and Gonnie cases.

Plaintiffs' Complaint sought a declaratory judgment that the Navajo Nation could not lawfully apply the NPEA against the Plaintiffs or regulate the employment policies of Plaintiffs in any way except as provided in the 1969 Lease.  (Doc. 1 at 12).  Plaintiffs further sought a preliminary injunction to prevent the Navajo Nation, through tribal officials, from regulating employment at NGS.  (Doc. 5).

The Navajo Defendants filed a Motion to Dismiss the Complaint (Doc. 34) with

the Court in March 2008.  In section 25 of the 1969 Lease there is an arbitration clause that requires all disagreements or disputes between the parties to be submitted to the Secretary of the Interior for decision.  (Doc. 5-3 Ex. 1 at 15-23).  In their motion to dismiss, Defendants argued that Plaintiffs must submit the jurisdictional dispute to the Secretary pursuant to section 25 and could not file the case with the District Court as a first resort.

In addition to filing this case on February 29, on February 4, 2008, Plaintiffs pursued dispute resolution before the Secretary.  Plaintiffs sent a letter to the Secretary requesting that he rule that the NPEA does not apply to SRP or Headwaters at NGS. (Doc. 5-9 Ex. 12).

The Secretary initially responded in a letter dated May 10, 2008, by finding that the Navajo Nation had not clearly waived the Nation's right to regulate employment relationships at NGS in the 1969 Lease.  (Doc. 55-2 Ex. 1 to Ex. A).  Following that response, SRP sent correspondence dated June 24, 2008 to the Secretary requesting reconsideration of his decision.  (Doc. 55-2 Ex. 2 to Ex. A).  In a letter dated August 1, 2008, a different Acting Deputy Assistant Secretary indicated that the Secretary would entertain the request for reconsideration.  (Doc. 55-2 Ex. 3 to Ex. A).  Then, in a letter dated October 2, 2008, the Secretary declined to decide the jurisdictional dispute and instead deferred to the Court's determination of this litigation.  (Doc. 74-2 Ex. 1-Ex. B).

In January 2009, the Court granted Defendants' Motion to Dismiss.  (Doc. 89). The Court found that rather than the Secretary deferring to the Court's determination of the applicability of the NPEA at the NGS, the Secretary should be the party to decide the issue per the terms of section 25 of the 1969 Lease.  (*Id*.)  In February 2009, Plaintiffs appealed the Court's order granting the Motion to Dismiss to the Ninth Circuit Court of Appeals.  (Doc. 95).  In March 2010, the Court of Appeals reversed this Court's decision in an unpublished opinion and remanded the case to this Court for further proceedings holding that Plaintiffs' claims were properly before the Court.  (Doc. 109-1 at 3); *Salt River Project Agr. Imp. & Power District v. Lee*, 2010 WL 1041492, 371 Fed. Appx. 779

1   (9th Cir. 2010) (SRP I).

2       With the case back before the Court, in July 2010, Defendants filed another

3   Motion to Dismiss pursuant to Federal Rule of Civil Procedure 19.  (Doc. 125).  In

4   December 2010, the Court granted Defendants' second motion to dismiss on the grounds

5   that this action was based in large part on interpreting the 1969 Lease to which the

6   Navajo Nation was a signatory and therefore the Navajo Nation should be joined as a

7   party.  (Doc. 150 at 9).  Joinder, however, was not feasible because the Navajo Nation

8   had sovereign immunity.  (*Id.*)  Plaintiffs then appealed this Court's order to the Court of

9   Appeals.

10      In March 2012, the Court of Appeals reversed the Court's order dismissing the

11  case and remanded to the Court for further proceedings in *Salt River Project Agr. Imp. &*

12  *Power v. Lee*, 672 F.3d 1176 (9th Cir. 2012) (SRP II).  Following this ruling by the Court

13  of Appeals, the parties filed the motions at issue in July and August 2012.

14  **III.    DEFENDANTS' MOTION TO DISMISS PARTIES**

15      Defendants Yazzie, Grant, and Shirley (the "Justices"), who are each current or

16  former Justices of the Navajo Nation Supreme Court, have moved to be dismissed from

17  this action because they are protected by immunity.  (Doc. 169 at 2).  The Justices argue

18  that they are protected by sovereign immunity because the doctrine established by the

19  United States Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908), does not apply to

20  them.  (*Id.*)  Further, the Justices contend that absolute judicial immunity applies and

21  protects them from claims for injunctive relief.  (*Id.* at 8).

22      **A.    *Ex Parte Young***

23      The Justices propose a two part argument for why the *Ex parte Young* doctrine

24  does not apply and they are immune here.  First, the Justices argue they must have acted

25  in contravention of federal law for *Ex parte Young* to apply, and by acting within the

26  scope of their judicial authority to determine tribal jurisdiction they did not violate

27  federal law. (Doc. 169 at 4). Second, the Justices argue that for *Ex parte Young* to apply,

28  officials must have a tangible connection to the enforcement of the law at issue, and the

1  Justices have no material connection to the enforcement of the NPEA against Plaintiffs.
2  (*Id*. at 6).

3                    **1.      Violation of Federal Law**

4        Generally, under the Eleventh Amendment the States enjoy sovereign immunity.
5  This immunity extends to State officials when acting in their official capacity.  However,
6  the *Ex parte Young* doctrine is a narrow exception to this general rule which allows
7  government officials to be sued in their official capacity for violating federal law, without
8  the presence of the immune State.  *SRP II*, 672 F.3d at 1181.  "The *Ex parte Young*
9  doctrine applies to Indian tribes as well." *Vann v. United States Dep't of the Interior*, No.
10  11-5322, 2012 WL 6216614, at *3 (D.C. Cir. Dec. 14, 2012) (citing *Okla. Tax Comm'n v.*
11  *Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 514 (1991)).  Under *Ex*
12  *parte Young*, "tribal sovereign immunity does not bar a suit for prospective relief against
13  tribal officers allegedly acting in violation of federal law." *Burlington N. & Santa Fe*
14  *R.R. Co. v. Vaughn*, 509 F.3d 1085, 1092 (9th Cir. 2007) (citations omitted).

15        The Justices acknowledge *Ex parte Young* as explained by the Ninth Circuit Court
16  of Appeals in *Burlington*, but then the Justices cite *Hardin v. White Mountain Apache*
17  *Tribe*, 779 F.3d 476, 479 (9th Cir. 1985), for the proposition that, "tribal immunity
18  extends to individual tribal officials acting in their representative capacity and within the
19  scope of their authority." (Doc. 169 at 4).  The Justices' central argument on this point is
20  that in holding that the NPEA could be enforced at NGS they were acting within the
21  scope of their authority and were not subject to suit under *Ex parte Young*.  (Doc. 169 at
22  6).  What the Justices have done, however, is reverse the order of the quotes from
23  *Burlington* and *Hardin* to misstate the rule.  The Justices make this misstatement again in
24  their Reply when they claim "[w]here 'officials are acting in their respective capacity and
25  within the scope of their authority,' tribal immunity applies and prevents suits brought,
26  *even under Ex parte Young*."  (Doc. 178 at 4 citing *Hardin*, 779 F.2d at 479) (emphasis
27  added).

28        To properly explain the rule for sovereign immunity of tribal officers, the quote

explaining *Ex parte Young* should be placed after the general rule as quoted in *Hardin*, as it was by the Court of Appeals in *Burlington*.   In *Burlington*, the Court of Appeals explained,

> sovereign immunity bars suit against an Indian tribe in federal court.  *Kiowa Tribe of Okla.*, 523 U.S. at 754.  This immunity protects tribal officials acting within the scope of their valid authority.  *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 479–80 (9th Cir. 1985).
>
> Under the doctrine of *Ex Parte Young*, immunity does not extend to officials acting pursuant to an allegedly unconstitutional statute. 209 U.S. 123, 155–56 (1908) (holding that Eleventh Amendment immunity was not a bar to suit against the state's Attorney General to enjoin him from enforcing a law that the plaintiffs alleged violated the Due Process Clause of the Fourteenth Amendment).  This doctrine has been extended to tribal officials sued in their official capacity such that "tribal sovereign immunity does not bar a suit for prospective relief against tribal officers allegedly acting in violation of federal law."  *Burlington N. R.R. Co. v. Blackfeet Tribe*, 924 F.2d 899, 901 (9th Cir. 1991), *overruled on other grounds by Big Horn County Elec. Coop., Inc. v. Adams*, 219 F.3d 944, 953 (9th Cir. 2000).

*Burlington*, 509 F.3d at 1091-92.

In *Hardin*, the Court of Appeals upheld a finding of sovereign immunity in favor of tribal police officers who had forcibly removed a non-Indian member from his home on the reservation after the tribal council had decided to exclude him permanently from the reservation.   The tribal officers were carrying out a direct order from the tribal council.  *Hardin*, 779 F.2d at 479-480.  The *Ex parte Young* doctrine, however, was not addressed by the Court of Appeals in *Hardin*.  *Ex parte Young* is the exception to the general rule of tribal immunity as stated in *Hardin*—*Hardin* is not the exception to *Ex parte Young*.  *See Burlington*, 509 F.3d at 1092 (citing *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002) (referring to the doctrine as "the *Ex parte Young* exception")).

To apply sovereign immunity in the way the Justices have argued, it would

effectively make *Ex parte Young* inapplicable in any case.  *Ex parte Young*, however, is still controlling law.  Further, the Ninth Circuit Court of Appeals explicitly stated when this case was on appeal, that "[t]his lawsuit for prospective injunctive relief may proceed against the officials under a routine application of *Ex parte Young*."  *SRP II*, 672 F.3d at 1181.

"In determining whether *Ex Parte Young* is applicable to overcome the tribal officials' claim of immunity, the relevant inquiry is only whether [plaintiff] has alleged an ongoing violation of federal law and seeks prospective relief."  *Burlington*, 509 F.3d at 1092 (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645–46 (2002)).  Thus, the question before the Court is whether Plaintiffs have alleged an ongoing violation of federal law.

Looking at the Complaint, Plaintiffs allege that,

> Defendants [including the Justices] have proceeded . . . against SRP . . . in the operation of NGS beyond Defendants' jurisdiction, without basis in law, and in violation of federal law, as the [Navajo Nation Supreme Court] has no authority to order the NNLC to proceed in the Thinn and Gonnie matters . . . and all such actions have no basis in law, and violate federal law, the determination that the Navajo Nation still had that authority is what violated federal law.

(*See* Doc. 1 at 13 ¶ 56).  The Justices have told the NNLC that the NPEA applies at NGS, and told the NNLC to proceed against Plaintiffs on the Thinn and Gonnie claims under the NPEA.  This is a looming order by the Justices, still in effect, which the NNLC is bound to follow.

This was the same violation of federal law made by the Navajo Nation Supreme Court in *Arizona Public Service Co. v. Asppas*, 77 F.3d 1128 (9th Cir. 1996).  In *Aspaas*, the Navajo Nation Supreme Court had also ruled that the NPEA was enforceable against the nonmember plaintiff.  *Id*. at 1131.  The plaintiff sued Justices of the Navajo Nation Supreme Court among various other Navajo officials for the same reason in this case— that enforcement of the NPEA against the plaintiff was a violation of federal law.  *Id*.

- 9 -

The Ninth Circuit Court of Appeals rejected the official Navajo defendants', including the Justices', argument that they were protected by sovereign immunity and allowed plaintiff's claims to be successfully asserted against them.  *Id*. at 1133-34.

Given Plaintiffs' Complaint, the Court finds the allegations are sufficient under *Ex parte Young* to claim an ongoing violation of federal law by the Justices.

### 2.    Enforcement

The Justices second argument for why *Ex parte Young* does not apply is that they are not involved in any enforcement action, are not charged with the enforcement, and do not have a tangible connection to the enforcement of the alleged violation.  (Doc. 169 at 6).

"[N]amed officials must have the requisite enforcement connection to the challenged law for the *Ex Parte Young* exception to apply."  *Burlington*, 509 F.3d at 1092 (citations and quotations omitted).  According to the Justices, the requisite connection "mean[s] that the official must have some meaningful participation in the actual enforcement of the law."  (Doc. 169 at 6).  The question for the Court is what satisfies the requisite enforcement connection.

In *Burlington*, the nonmember plaintiff sued two tribal officials in their official capacity for taxing the plaintiff in violation of federal law.  509 F.3d at 1089.  One official was the official allegedly responsible for administering and collecting the challenged tax.  The other official was the Tribal Chairman and was responsible for exercising executive authority over the Tribe.  Plaintiff had made no allegations that the Tribal Chairman was in any way responsible for enforcing the tax.  The Court of Appeals found that the plaintiff's failure to allege that the Tribal Chairman was "in any way responsible for enforcing" the tax, prevented the *Ex parte Young* exception from applying to the Chairman.  *Id*. at 1093.  However, the Court of Appeals did find that plaintiff's allegations against the other tribal official were enough of a connection for *Ex parte Young* to apply.  *Id*.

The Court of Appeals exclusively cited their previous opinion in *National*

*Audubon Society, Inc. v. Davis*, 307 F.3d 835 (9th Cir. 2002), for their reasoning in *Burlington*. 509 F.3d at 1089.  In *National Audubon Society*, plaintiffs sued the Governor of California, the state Secretary of Resources and the Director of the California Department of Fish & Game among other defendants for their role in enforcing an allegedly unconstitutional voter approved law restricting the use of certain kinds of animal traps.  The Court of Appeals found that *Ex parte Young* did not apply to the Governor and Secretary of Resources because plaintiffs failed to make any showing that these parties had the requisite enforcement connection.  *Nat'l Audubon Soc'y*, 307 F.3d at 847.  However, the Court of Appeals found that the Director of the Department of Fish & Game did have the requisite connection for *Ex parte Young* to apply because he had direct authority over and principal responsibility for enforcing the law.  *Id.*

Unlike the Tribal Chairman in *Burlington*, who merely had executive authority and had not allegedly made any decisions or taken any action with respect to the taxes at issue in that case, and the Governor and Secretary of Resources in *National Audubon Society*, who also merely possessed executive authority over the State, the Justices here are not just executives, they have taken action and made decisions directly related to the alleged ongoing violation of federal law.

As Plaintiffs contend, the Justices are a critical part of the Tribe's enforcement of the NPEA.  (Doc. 173 at 9).  Under the NPEA, once the ONLR and the NNLC have issued their decisions with respect to whether the NPEA applies to nonmembers, the Justices are the final tribal decision maker for parties to seek relief from.  15 Navajo Nation Code § 613(A).  In this case, the Justices played a direct role in attempting to enforce the NPEA against Plaintiffs.  When the original claims by Thinn and Gonnie were initially brought to the NNLC, the NNLC found that the tribe did not have jurisdiction to apply the NPEA, but the Justices reversed the NNLC finding.  The tribe would not be, and could not be, attempting to enforce the NPEA against Plaintiffs absent the actions of the Justices.  Consequently, the Court finds that Plaintiffs have alleged enough of an enforcement connection to the challenged law.

1    Therefore, because Plaintiffs have alleged an ongoing violation of federal law and

2    alleged enough of an enforcement connection to that law, *Ex parte Young* applies and

3    sovereign immunity does not to apply to the Justices.

4    **B.    Judicial Immunity**

5    Finally, the Justices argue that they should be dismissed because they enjoy

6    judicial immunity from claims for injunctive relief.  (Doc. 169 at 8).

7    The Justices are being sued in their official capacity.  A judicial immunity defense

8    does not apply to official capacity claims.  In *Kentucky v. Graham*, the United States

9    Supreme Court explained,

10          When it comes to defenses to liability, an official in a
11          personal-capacity action may, depending on his position, be
            able to assert personal immunity defenses, such as objectively
12          reasonable reliance on existing law.  In an official-capacity
13          action, these defenses are unavailable.  The only immunities
            that can be claimed in an official-capacity action are forms of
14          sovereign immunity that the entity, *qua* entity, may possess,
15          such as the Eleventh Amendment.

16   473 U.S. 159, 166-67 (1985); *see also Pulliam v. Allen*, 466 U.S. 522, 541-542 (1984)

17   ("We conclude that judicial immunity is not a bar to prospective injunctive relief against

18   a judicial officer acting in her judicial capacity.").

19   In this case, the Court has already rejected the Justices sovereign immunity

20   defense under the Eleventh Amendment.  As explained, the *Ex parte Young* exception

21   apples in this case.  Further, judicial immunity does not apply here because the Justices

22   were not sued in their individual capacity.  Consequently, the Justices are not immune to

23   Plaintiffs' claims.

24   **IV.    CROSS MOTIONS FOR SUMMARY JUDGMENT**

25   Both parties have moved for summary judgment.  Plaintiffs allege that Navajo

26   officials have violated federal law by acting beyond their scope of authority in trying to

27   regulate employment at NGS through the NPEA, and further, any authority Defendants

28   could have had to regulate employment was waived by the terms of the 1969 Lease.

(Doc. 162 at 9-14, 16-17).  Defendants argue that employment regulation on tribal land is an issue of tribal law and the power to regulate has not been waived.  (Doc. 165 at 9).  Both parties seek a declaratory judgment by this Court.  (Doc. 162 at 20); (Doc. 165 at 21).  Plaintiffs further seek injunctive relief.  (Doc. 162 at 20).

The parties' claims present two primary issues to the Court.  The first issue is sovereign authority, specifically, whether the Navajo Nation has the sovereign authority to regulate the employment policies of a non-Indian employer.  The second issue is whether the Navajo Nation waived that sovereign authority by the terms of the 1969 Lease.

The sovereign authority issue centers on whether the United States Supreme Court's decision in *Montana v. United States*, 450 U.S. 544 (1980), applies to the circumstances here.

The waiver issue centers on the word "operation" as it is used in section 16 of the 1969 Lease, where "the Tribe covenants that, other than as expressly set out in this Lease, it will not directly or indirectly regulate or attempt to regulate the Lessees in the construction, maintenance or operation of [NGS]."  (Doc. 5-3 Ex. 1 at 9).  The question is whether the term "operation" encompasses employment policies.

Before the Court can determine whether either party is entitled to judgment as a matter of law on the two primary issues, the Court must address two threshold issues the parties have also raised.  First, Defendants argue this action should not be before the Court because tribal jurisdiction is solely an issue of tribal law.  Second, before the Court can determine the limits of the Navajo Nation's jurisdiction, the Navajo Nation must have been given the opportunity to determine its own jurisdiction.

A.    **THRESHOLD ISSUES**

1.    **Employment Regulation of a Non-Indian Employer is an Issue of Federal Law**

As an initial matter, this case is properly before the Court because it implicates an issue of federal law.  Defendants argue that employment regulation on tribal land is

solely an issue of tribal law; to wit, the Navajo Nation has jurisdiction over employment issues at NGS because of the consensual relationship between Plaintiffs and Defendants. (Doc. 165 at 9).  Further, Defendants contend because this is an issue of tribal law the Court should dismiss this action and uphold tribal jurisdiction.  *Id.*  The Court disagrees.

The issue before the Court is whether the Navajo Nation Supreme Court and NNLC have exceeded the limits of their jurisdiction by trying to apply the NPEA to SRP and Headwaters.  In *National Farmers Union Ins. Cos. v. Crow Tribe*, the United States Supreme Court held that "the question of whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a federal question under [28 U.S.C.] § 1331."  471 U.S. 845, 852 (1985).  In a nearly identical set of circumstances to the case at bar, the Ninth Circuit Court of Appeals explained in *Arizona Public Service Co. v. Aspaas*, that this rule from *National Farmers* applies to non-Indian lessees as well as non-Indian land owners on Indian land.  77 F.3d 1128, 1132 (9th Cir. 1996).  Therefore, this action is properly before the Court because 28 U.S.C. § 1331 renders the question of whether "the Navajo Nation can apply tribal law to regulate the activities of a non-Indian" lessee an issue of federal law.  *Id*.

## 2.     The Rule of Exhaustion has been Satisfied

This case is also properly before the Court because the Navajo Nation Supreme Court and the Secretary of the Interior have made their decisions, and found that the Navajo Nation has the jurisdiction to regulate Plaintiffs.

*National Farmers* established a prudential rule of exhaustion that has been satisfied here.  471 U.S. at 857 (while "§ 1331 encompasses the federal question whether a tribal court has exceeded the lawful limits of its jurisdiction . . . exhaustion is required before such a claim may be entertained in federal court.").  Exhaustion means the tribal court has had a full opportunity to determine its own jurisdiction.  *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987) ("[T]he federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a full opportunity to

determine its own jurisdiction." (quotation marks and citation omitted)); s*ee also Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1246 (9th Cir. 1991), *overruled on other grounds by Big Horn County Elec. Coop., Inc. v. Adams*, 219 F.3d 944, 953 (9th Cir.2000) ("[T]he [] tribe must itself first interpret its own ordinance and define its own jurisdiction . . . . The practical imperative of judicial efficiency also compels exhaustion of tribal remedies."). Thus, the Navajo Nation has made a final determination of its own jurisdiction—the Navajo Nation Supreme Court ruled that the NNLC has the jurisdiction to enforce the NPEA against Plaintiffs. Further, the Court of Appeals has also held that the Secretary of the Interior has exhausted his involvement in this claim. *SRP I*, 371 Fed. Appx. at 780. Accordingly, tribal courts and the Secretary have had a full opportunity to determine the Navajo Nation's jurisdiction here, and the question of whether the Navajo Nation has then exceeded its jurisdiction is properly before the Court.

### B.   PRIMARY ISSUES

#### 1.   Sovereign Authority to Regulate Employment

Before the Court can determine if the Navajo Nation has waived its authority by the terms of the 1969 Lease, the Court must determine whether the Navajo Nation has the authority to regulate the employment policies of a non-Indian employer.

##### a.   Whether *Montana* Applies is Irrelevant

Plaintiffs argue that whether the tribe has the authority to regulate employment is governed by the test set forth in *Montana v. United States* and its progeny. (Doc. 162 at 9-14). *Montana* stands for the general rule "that the inherent powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana v. United States*, 450 U.S. 544, 565 (1980). This rule, however, came with two exceptions. The *Montana* Court stated:

> [There are two circumstances in which] Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. [1] A tribe may regulate, through

taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.  [2] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Montana*, 450 U.S. at 565-566 (internal citations omitted).

Plaintiffs argue that the general rule of *Montana* governs and that the relationship between Plaintiffs and Defendants does not implicate either exception.  (Doc. 162 at 11-13).  On the other hand, Defendants argue that *Montana* does not apply to this case and the tribe has the sovereign authority to regulate employment policies at NGS.  (Doc. 165 at 9-11).  Further, Defendants contend that even if *Montana* did apply, an exception to *Montana* would also apply and the tribe would still have the sovereign authority to regulate employment.  (*Id*. at 11-13).

Under the circumstances of this case, any determination of whether *Montana* applies centers on the ownership of the land—whether the nonmembers of the tribe are on Indian or non-Indian land.  In *Montana*, the central issue was whether the tribe could apply tribal law to nonmembers *on non-Indian land*.  450 U.S. at 547.

Plaintiffs argue the *Montana* rule governs regardless of the classification of the land here.  First, Plaintiffs contend that the general rule of *Montana* applies because the land NGS operates on is non-Indian land for purposes of tribal regulation due to the § 323 Grant.  (Doc. 162 at 14).  In the alternative, Plaintiffs contend that even if the land was not considered non-Indian fee land, the Supreme Court's decision in *Nevada v. Hicks* stands for a broad interpretation of *Montana*, where the general rule of *Montana* applies to nonmembers on both Indian and non-Indian land.  (*Id*. at 6); (Doc. 175 at 5).

Plaintiffs' argument is not unfounded.  The Supreme Court explicitly stated in *Hicks* that the reasoning in *Montana* "clearly impl[ies] that the general rule of *Montana*

applies to both Indian and non-Indian land." *Nevada v. Hicks*, 533 U.S. 353, 359-360 (2001). In spite of this apparently clear language, the Ninth Circuit Court of Appeals' *per curiam* holding in *Water Wheel Camp Recreational Area v. LaRance*, 642 F.3d 802 (9th Cir. 2011), cannot be disregarded by the Court.

In *Water Wheel*, the Court of Appeals found that the holding in *Hicks* still allowed only a narrow interpretation of the general rule in *Montana*, where it applied only on non-Indian land. The *Water Wheel* Court explained:

> Even though in its analysis the [Supreme] Court interpreted *Montana* broadly as applying to both Indian and non-Indian land, the Court explicitly recognized that in some cases, land ownership "may sometimes be a dispositive factor" in establishing a tribal court's regulatory jurisdiction over non-Indians. *Hicks*, 533 U.S. at 360. *Hicks* expressly limited its holding to "the question of tribal-court jurisdiction over state officers enforcing state law" and left open the question of tribal court jurisdiction over nonmember defendants generally. *Id*. at 358 n.2; *id*. at 371 (noting that the issue being considered concerned "a narrow category of outsiders"). Furthermore, the Court did not overrule its own precedent specifying that *Montana* ordinarily applies only to non-Indian land.
>
> We have recognized the limited applicability of *Hicks*. *See McDonald v. Means*, 309 F.3d 530, 540 n.9 (9th Cir. 2002) (rejecting the argument that *Montana* should be extended to bar tribal jurisdiction over the conduct of non-Indians on tribal land because doing so would be inconsistent with *Montana's* narrow holding and "[e]ven if *Hicks* could be interpreted as suggesting that the *Montana* rule is more generally applicable than either *Montana* or *Strate* have allowed, *Hicks* makes no claim that it modifies or overrules *Montana*") . . . .
>
> To summarize, Supreme Court and Ninth Circuit precedent, as well as the principle that only Congress may limit a tribe's sovereign authority, suggest that *Hicks* is best understood as the narrow decision it explicitly claims to be. *See Hicks*, 533 U.S. at 358 n.2. Its application of *Montana* to a jurisdictional question arising on tribal land should apply

only when the specific concerns at issue in that case exist. Because none of those circumstances exist here, we must follow precedent that limits *Montana* to cases arising on non-Indian land.  Doing otherwise would impermissibly broaden *Montana's* scope beyond what any precedent requires and restrain tribal sovereign authority despite Congress's clearly stated federal interest in promoting tribal self-government. *See New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335–36 (1983) (recognizing that as a "necessary implication" of Congress's broad commitment to further tribal self-government, "tribes have the power to manage the use of [their] territory and resources by both members and nonmembers, to undertake and regulate economic activity within the reservation, and to defray the cost of governmental services by levying taxes" (internal citations omitted)).

642 F.3d at 813-814.

Making the matter even more elusive, in a recent opinion involving a nonmember bringing a tort claim against a tribal business on Indian land, another judge in this Court invoked the Supremacy Clause of the United States Constitution to find that *Montana* did in fact govern on Indian and non-Indian land alike.  *Rolling Frito-Lay Sales LP v. Stover*, No. CV 11–1361, 2012 WL 252938, at *3 (D. Ariz. Jan. 26, 2012) ("To the extent that the *per curiam* opinion in *Water Wheel* departs from Supreme Court jurisprudence in the area of Federal Indian Law, we are constrained by the Supremacy Clause, Art. VI, and Article III ('one supreme Court') to follow the Supreme Court.  *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983).  We thus apply *Montana* to this case.")  Given this setting, the Court declines to wade into an unnecessary analysis of whether *Montana* applies on both Indian and non-Indian fee land.

In this case, whether *Montana* applies or not is irrelevant because of the exception the Supreme Court delineated in *Montana* and the consensual relationship between the parties here which fulfills that exception.  If an exception to *Montana* applies, then regardless of whether this Court were to find that *Montana* governs on non-Indian fee land only (as Defendants claim) or Indian and non-Indian land alike (as Plaintiffs claim), the result would be the same—the tribe would have the sovereign authority at issue.  If

the tribe has the sovereign authority to regulate employment, the only question is whether this authority was waived.  Thus, the *sine qua non* at this point is not whether *Montana* applies, it is whether an exception to *Montana* would apply, and the Court finds that the first *Montana* exception would apply.

### b. The First *Montana* Exception Would Apply

Assuming arguendo, that *Montana* applies on Indian land and no valid reason exists to classify the land at issue as non-Indian fee land, the tribe cannot regulate the activities of a nonmember on their reservations or on non-Indian fee land *unless* the nonmember has entered into a "consensual relationship with the tribe or its members." *Montana*, 450 U.S. at 565-566 (explaining the first *Montana* exception).  Given that this rule from *Montana* is a general rule,

> efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are "presumptively invalid."  The burden rests on the tribe to establish one of the exceptions to *Montana's* general rule that would allow an extension of tribal authority to regulate nonmembers . . . .  These exceptions are "limited" ones and cannot be construed in a manner that would "swallow the rule," or "severely shrink" it.

*Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008) (citations omitted).

Subsequent decisions by the Supreme Court have clarified the types of regulations and consensual relationships that fulfill the first *Montana* exception.  First, "[t]he consensual relationship must stem from 'commercial dealing, contracts, leases, or other arrangements.'"  *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 655 (2001) (quoting *Montana*, 450 U.S. at 565).  This type of relationship establishes consent by a nonmember to be governed by tribal law.  Consent alone, however, is not enough.  *See Plains*, 554 U.S. at 337.

Second, "*Montana's* consensual relationship exception requires that the . . . regulation imposed by the Indian tribe have a nexus to the consensual relationship itself . . . .  A nonmember's consensual relationship in one area thus does not trigger tribal civil

authority in another—it is not in for a penny, in for a pound." *Atkinson*, 532 U.S. at 656 (citation omitted); *see also Atkinson Trading Co., Inc. v. Manygoats*, No. CIV 02–1556, 2004 WL 5215491, at *8 (D. Ariz. Mar. 17, 2004) (finding "a nexus requirement analysis is only necessary if the Court first finds that a consensual relationship, as contemplated by the *Montana* Court, exists.").

Finally, the regulation must "be justified by reference to the tribe's sovereign interests." *Plains Commerce Bank*, 554 U.S. at 336. Put another way, after a qualifying consensual relationship is established, "even then, the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." *Id.* at 337. The Supreme Court explained:

> certain forms of nonmember behavior, even on non-Indian fee land, may sufficiently affect the tribe as to justify tribal oversight. While tribes generally have no interest in regulating the conduct of nonmembers, then, they may regulate nonmember behavior that implicates tribal governance and internal relations. The regulations we have approved under *Montana* all flow directly from these limited sovereign interests.

*Id.* at 335.

Thus, the Court must look to whether Defendants have shown (1) that the relationship stems from commercial dealing, a contract, or a lease; (2) that the regulation has a nexus to the relationship; and (3) that regulating employment stems from the tribe's authority to set conditions on entry, preserve tribal self-government, or control internal relations.

### i.   The Consensual Relationship Stems from Commercial Dealing

To establish that the first *Montana* exception applies, Defendants argue that "[t]he 1969 Lease is exactly the kind of consensual relationship that the *Montana* Court considered when creating the first exception to its general rule." (Doc. 165 at 7). In determining if Defendants' argument meets their burden, "the Court may not simply use

the plain meaning definition of the word 'consensual' here.  Instead, the Court must determine whether the relationship was 'consensual' as contemplated by the Supreme Court when it created the *Montana* exceptions."  *Manygoats*, 2004 WL 5215491, at *9.

Defendants point out that the very language used by the *Montana* court clearly encompasses commercial contracts and leases as the type of consensual relationship needed for the exception.  (Doc. 165 at 7).  The Court notes that the Supreme Court's description of what meets the first *Montana* exception goes even further than commercial contracts and leases by contemplating unspecified other arrangements that would still give the tribe the authority to regulate nonmembers on Indian and non-Indian fee land.  *Montana*, 450 U.S. at 565 ("A tribe may regulate, through . . . other means, the activities of nonmembers who enter consensual relationship with the tribe or its members, through commercial dealing . . . or other arrangements.").

Any of these types of relationships establish the consent required under *Montana*.  To say that Plaintiffs have not entered into a consensual relationship contemplated by *Montana* would mean that the contractual lease between SRP and the Navajo Nation, that Plaintiffs themselves repeatedly refer to as a lease and seek to interpret as a binding contract, is not actually a contract, lease, or other arrangement in spite of the plain meaning of the words.  The language of the *Montana* court is unambiguous and, without something more, the Court declines to give new meaning to patently clear words.

Plaintiffs argue that another judge in this Court rejected this same argument for consent in *Manygoats*, where the court said "[a]n employment relationship is a consensual relationship in the sense that the employer consents to the employee working at the establishment. . . . The consent required to trigger the first *Montana* exception, however, requires much more.  *Montana* requires consent to jurisdiction, either expressed, or implied by the parties' behavior."  (Doc. 175 at 13) (quoting *Manygoats*, 2004 WL 5215491, at *9).  In that case, unlike the case at bar, there was no contract between the nonmember employer and member employee and, even more importantly, no contract existed between the nonmember employer and the tribe itself.  The court's

explanation in *Manygoats* highlights these key differences.  There, the court said it "finds that the employment of a tribal member, by itself, is not enough to invoke jurisdiction of the tribe as a matter of law . . . . an employer who does nothing to subject himself to tribal jurisdiction other than hiring a tribal member has not expressly or impliedly consented to jurisdiction."

Plaintiffs in this case have done far more than merely employ tribal members.  Unlike the employer in *Manygoats*, SRP has entered into a contract/lease for commercial dealing with the tribe itself.  Accordingly, the Court finds Defendants have met their initial burden under the qualification in *Atkinson* and shown that the consensual relationship here stems from the requisite commercial dealing.  *See* 532 U.S. at 655 (the consensual relationship must stem from commercial dealing, a contract, or a lease).

ii. **The Regulation has a Nexus to the Consensual Relationship**

Defendants, however, must also establish that the regulation they seek to impose has a nexus to the consensual relationship itself.  *See id*. at 656.  The Court must ensure the exception does not "swallow" the general rule or "severely shrink" it.  *See Plains Commerce Bank*, 554 U.S. at 330.  Defendants seek to impose the regulatory scheme of the NPEA on Plaintiffs.  Accordingly, the NPEA must have a nexus to the subject matter of the 1969 Lease.  *See Water Wheel*, 642 F.3d at 817 (upholding the district court's finding that the non-Indian corporation's long term business lease with the tribe for the use of tribal property established a consensual relationship and that the tribe's eviction action bore a close nexus to that relationship).

The 1969 Lease is more than just an agreement that Plaintiffs will rent tribal land, the lease explicitly deals with employment and operations at NGS.  As Defendants explain, the 1969 Lease addresses employment of tribal members by giving them preference in hiring at NGS thus establishing the nexus required.  (Doc. 165 at 8).  Further, the very language Plaintiffs rely on to show that the tribe has waived their right

- 22 -

1    to regulate employment establishes the nexus required.[1]  Under Plaintiffs' own argument,

2    the non-regulation covenant must have a nexus to employment in order to waive the

3    tribe's right to regulate employment.   (*See id*. at 12).   The Court finds this evidence

4    sufficient to show that tribal employment regulations bear a close enough nexus to a lease

5    that addresses employment and operations at NGS.

6              ###    iii.    Regulating Employment Implicates Sovereign

7                             Authority

8              Finally, any regulation the tribe seeks to enforce must come "from the tribe's

9    inherent sovereign authority to set conditions on entry, preserve tribal self-government,

10   or control internal relations."  *Plains Commerce Bank*, 554 U.S. at 337.  The Court then

11   must determine if regulating employment implicates the tribe's sovereign authority to

12   control internal relations.  The Court finds it does.

13            In explaining the extent of *Montana* and its exceptions, the Supreme Court said in

14   *Plains Commerce Bank*, "[t]he logic of *Montana* is that certain activities on non-Indian

15   fee land (say, a *business enterprise employing tribal members*) . . . may intrude on the

16   internal relations of the tribe or threaten tribal self-rule.  To the extent they do, such

17   activities . . . may be regulated."  *Id*. at 334-335 (emphasis added).  The Court notes that

18   this statement by the Supreme Court applied to non-Indian land.  Logically, a business

19   enterprise employing tribal members on Indian land would affect the internal relations of

20   a tribe even more and give the tribe the inherent sovereign authority to regulate

21   employment at an even lower threshold.

22            In *FMC v. Shoshone-Bannock Tribes*, the Ninth Circuit Court of Appeals found

23   that the first *Montana* exception applied and the tribe could regulate the employment

24   practices of a non-Indian employer employing tribal members on non-Indian fee land.

25   905 F.2d 1311, 1314-1315 (9th Cir. 1990).  In making this decision, the Court of Appeals

26   _____

27        [1] Plaintiffs argue the non-regulation covenant waives the tribe's right to regulate
     employment because it explicitly says "[the tribe] will not directly or indirectly regulate
28   or attempt to regulate [Participants] in the . . . operation of [NGS] . . .".  (Doc. 162 at 3).

found the tribe had the inherent sovereign authority to regulate employment because, among other connections to the tribe, the employer had signed a contract relating to employment and employed merely a few tribal members.  *Id*.  Accordingly, both the Supreme Court and Court of Appeals consider the employment of tribal members by a non-Indian employer, especially on tribal land, may implicate the tribe's sovereign authority to control internal relations and thus fulfills the first exception of *Montana*.

The Court finds no compelling argument why the relationship between the Navajo Nation and Plaintiffs here does not support the same conclusion.  Like the employer in *FMC*, Plaintiffs clearly signed a contract that involves employment of tribal members.  Further, by SRP's own admission at oral arguments held on January 9, 2012, 84% of SRP's employees are Navajo tribal members.  Consequently, the Court finds Plaintiffs are a business enterprise with enough substantial connections to the tribe to intrude on internal relations and thus the Tribe has the inherent sovereign authority to regulate employment.

### 2.     Waiver of Sovereign Authority

As the Court has explained, the Navajo Nation has the right to regulate employment at NGS regardless of whether or not *Montana* applies to Indian or non-Indian land.  Accordingly, the central issue before the Court is the same issue that the Ninth Circuit Court of Appeals addressed in *Arizona Public Service Co. v. Aspaas*— "whether the Navajo Nation has agreed to a valid waiver of such right."  77 F.3d 1128, 1134 (9th Cir. 1996).  Like the Court of Appeals found in *Aspaas*, the Court finds that the Navajo Nation agreed in the 1969 Lease to waive its sovereign authority to regulate employment at NGS.

Indian tribes are sovereigns that can waive their sovereign powers.  The United States Supreme Court has held federal, state, local and Indian sovereigns:

> can waive sovereign power if they do so in sufficiently clear contractual terms:
>
> Each of these governments has different attributes of sovereignty, which also derive from different sources.  These

> differences, however, do not alter the principles for determining whether any of these governments has waived its sovereign power through contract, and we perceive no principled reason for holding that the different attributes of Indian sovereignty require different treatment in this regard. Without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign jurisdiction, and will remain intact unless surrendered in unmistakable terms.

*Id.* (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)).

If a sovereign power is waived, it must be done so clearly. If the sovereign power is not waived in unmistakable terms, the contract remains subject to subsequent legislation by the sovereign. *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 52 (1986) (quoting *Merrion*, 455 U.S. at 147). Consequently, the contract between SRP and the Navajo Nation must evince the requisite "unmistakable waiver" by tribal officials. To make this determination, the Court must evaluate the 1969 Lease. Defendants, however, have raised two arguments that they insist bar the Court from interpreting this contract. The Court will now address these arguments.

### a.     Interpretation of the 1969 Lease is Appropriate

#### i.     *Ex Parte Young* Allows Defendants to Stand in the Place of a Party to this Contract

First, Defendants argue that this Court cannot rule on whether the Navajo Nation waived its sovereign authority in the contract because that argument involves the interpretation of the 1969 Lease to which the Navajo Nation is a party and the Navajo Nation is not a party to this suit. (Doc. 165 at 13-15). Summing up their argument, Defendants argue this would violate fundamental contract law and they ask the Court to limit the scope of this case to only those parts arising under *Ex parte Young* and to forego any interpretation of the 1969 Lease. (*Id.* at 15).

When this case was previously on appeal to the Ninth Circuit Court of Appeals,

the court explained that the *Ex parte Young* "doctrine permits actions for prospective non-monetary relief against state or tribal officials in their official capacity to enjoin them from violating federal law, without the presence of the immune State or tribe." *SRP II*, 672 F.3d at 1181. The Court of Appeals then clearly placed this case within the ambit of *Ex parte Young* explaining that interpreting the 1969 Lease is a question of federal law and "*Ex parte Young* . . . applies to federal common law as well." *Id*. at 1182; *see also id*. at 1181-1182 ("federal common law governs whether an Indian tribe's lease with a non-Indian has waived the tribe's authority to regulate the non-Indian's activities."). Thus, Defendants are asking the Court to do the impossible—forego interpretation of the 1969 Lease, but adjudicate the parts of this case arising under *Ex parte Young*. The two issues cannot be separated. The parts of this action arising under *Ex parte Young* wholly include interpreting the 1969 Lease to determine if the tribe waived its authority. While the Navajo Nation is not a party to this suit, the Navajo official defendants sufficiently represent the tribe's interests to allow interpretation of the 1969 Lease.

Further, as Plaintiffs point out, the Court of Appeals addressed and ruled on the signatory issue in *SRP II* as well. (Doc. 175 at 22). The court held:

> Here, the Navajo official defendants can be expected to adequately represent the Navajo Nation's interests. . . . there is no indication that the tribe would offer any necessary element to the action that the Navajo official defendants would neglect. . . .
>
> Indeed, the Navajo official defendants do not argue otherwise. Instead, they argue only that **the tribe automatically is a necessary party to any action challenging a lease to which the tribe is a signatory**, citing *Dawavendewa v. Salt River Project*, 276 F.3d 1150 (9th Cir. 2002). But *Dawavendewa* is distinguishable because there—unlike here—the tribal officials were *not* parties to the action and thus could not represent the absent tribe's interests . . . .
>
> Thus, because the officials adequately represent the Navajo Nation's interests here, the district court erred in holding the tribe was a necessary party under Rule 19(a)(1)(B)(i).

- 26 -

. . . .

. . . [t]he Navajo Nation is not a necessary party under Rule 19(a)(1)(B)(i) because the officials adequately represent the tribe's interests.

*SRP II*, 672 F.3d at 1180-1181 (citations omitted) (emphasis added).  Accordingly, the Court finds that under the *Ex parte Young* doctrine, because the Navajo official defendants are a party here, the Navajo Nation does not have to be a party to this action and interpreting the 1969 Lease is appropriate.

### ii.  Tribal Council had the Authority to Waive the Tribe's Authority

Second, Defendants argue that the Court cannot interpret the 1969 Lease because the Navajo Nation Supreme Court held under Navajo law that the Advisory Committee of the Navajo Tribal Council, which approved and signed the 1969 Lease, had no authority in 1969 to waive the tribe's sovereign power to regulate employment at NGS.  (Doc. 165 at 18).  Defendants contend that this Court is bound by and must give deference to the Navajo Nation Supreme Court's finding of Navajo law.  (*Id*. at 19).

Defendants' argument raises two issues: first, whether the Tribal Council actually had the authority to waive the tribe's authority to regulate employment; and second, whether determining if the council's authority includes the power to waive the tribe's authority is an issue of tribal law solely determinable by the Navajo courts.

The Ninth Circuit Court of Appeals explicitly addressed both issues in *Aspaas*.  In *Aspaas*, Arizona Public Service Company ("APS") signed a lease in 1960 with the Navajo Nation to operate the Four Corners Power Plant ("FCPP") on tribal trust land located in New Mexico.  77 F.3d at 1129.  The Navajo Tribal Council approved the terms of the lease for the Navajo Nation.  *Id*. at 1135.  After the NPEA was passed in 1985, the ONLR initiated proceedings against APS for violating provisions of the NPEA by APS's employment policies.  *Id*. at 1131.  The Navajo Nation Supreme Court eventually held in favor of the tribe.  *Id*.  APS then filed a claim for declaratory and injunctive relief in the

district court.  *Id.*  The district court granted summary judgment for APS holding that the terms of the lease between APS and the Navajo Nation unmistakably waived the tribe's sovereign power to regulate employment at APS.  *Id.* at 1132.  The Court of Appeals affirmed the district court's decision.  *Id.* at 1135.

With respect to the two issues at hand in this case, first, the Court of Appeals clearly held in *Aspaas* that the Navajo Tribal Council had the authority in 1960 to waive the tribe's right to regulate employment at the FCPP.  The *Aspaas* court explained:

> The [Navajo official defendants] further contend that the Navajo Tribal Council, which approved the operative documents here (and later enacted the NPEA), lacked authority to waive sovereign police power in lease agreements.  This position is untenable.  As the governing body of the Navajo Nation, the Navajo Tribal Council is similar in function to the Congress of the United States.  The legitimacy of the Navajo Tribal Council, the freely elected governing body of the Navajos, is beyond question.  Thus, the Navajo Tribal Council had authority to effect a waiver of the Navajo Nation's power to subject a lessee to employment regulations.

*Id.* at 1135.  Accordingly, because no evidence has been presented showing that the power of the Navajo Tribal Council changed between 1960 and 1969, the Court finds that the Navajo Tribal Council also had the authority in 1969 to waive the Navajo Nation's sovereign authority to regulate employment at NGS.

Second, the Court of Appeals held that determining the limits of the Council's authority to waive regulation of a non-Indian was not an issue of tribal contract law determinable by the Navajo Nation Supreme Court, but an issue of federal common law properly before the federal courts.  *Id.* at 1132.

As Plaintiffs point out, the procedural history of *Aspaas* mirrors the history of this case.  In *Aspaas*, prior to being ruled on by the district court, the Navajo Nation Supreme Court also held that as a matter of Navajo law, the Navajo Tribal Council lacked the authority in 1960 to waive the tribe's right to regulate employment at the FCPP.  (Doc.

163 at 13 ¶ 64).  The Navajo Nation then made the same argument in *Aspaas* that it makes here—that this was solely an issue of Navajo law.  (*Id*. at 14 ¶ 65).  The district court in *Aspaas* held, and the Court of Appeals affirmed, that the issue of whether the tribal council could waive the tribe's sovereign authority to regulate employment was not a matter of Navajo law, but a matter of federal law.  (*Id*. at 14 ¶ 66); *Aspaas*, 77 F.3d at 1132, 1135 (recognizing the issue was not governed by tribal contract law but by federal common law and affirming the district court's holding).  Given the holding in *Aspaas*, the Court finds that deciding whether the tribal council had the authority to waive the tribe's sovereign authority to regulate a non-Indian is an issue of federal law properly determinable by this Court.  Therefore, because the Tribal Council had the authority to waive the Tribe's sovereign authority and because this determination is an issue of federal law, interpretation of the 1969 Lease is appropriate.

### b.  The Tribe Waived its Sovereign Authority in Unmistakable Terms

Finally, the Court turns to whether the Navajo Nation has waived its sovereign authority to regulate employment in unmistakable terms.  The parties disagree on whether the 1969 Lease unambiguously waives the tribe's sovereign authority.  Both parties have moved for summary judgment based in large part on this issue.  (Doc. 162 at 16-17); (Doc. 165 at 15-17).

### i.  Summary Judgment is Appropriate

Summary judgment, however, is only warranted when the remaining issues at hand are solely questions of law.  The Court finds that interpreting the 1969 Lease to determine if it waives the tribe's authority is a question of law.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record," or by "showing that materials cited do not establish the absence or presence of a

1   genuine dispute, or that an adverse party cannot produce admissible evidence to support

2   the fact." *Id.* 56(c)(1)(A)&(B). Thus, summary judgment is mandated "against a party

3   who fails to make a showing sufficient to establish the existence of an element essential

4   to that party's case, and on which that party will bear the burden of proof at trial."

5   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

6       Initially, the movant bears the burden of pointing out to the Court the basis for the

7   motion and the elements of the causes of action upon which the non-movant will be

8   unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to

9   the non-movant to establish the existence of material fact. *Id.* The non-movant "must do

10  more than simply show that there is some metaphysical doubt as to the material facts" by

11  "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'"

12  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting

13  Fed. R. Civ. P. 56(e) (1963) (amended 2010)). In the summary judgment context, the

14  Court construes all disputed facts in the light most favorable to the non-moving party.

15  *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

16      The mere existence of some alleged factual dispute between the parties will not

17  defeat an otherwise properly supported motion for summary judgment; the requirement is

18  that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

19  242, 247-248 (1986). A material fact is any factual issue that might affect the outcome of

20  the case under the governing substantive law. *Id*. at 248. A material fact is "genuine" if

21  the evidence is such that a reasonable jury could return a verdict for the non-moving

22  party. *Id*.

23      At the summary judgment stage, the trial judge's function is to determine whether

24  there is a genuine issue for trial. There is no issue for trial unless there is sufficient

25  evidence favoring the non-moving party for a jury to return a verdict for that party. *Id*. at

26  249-250. If the evidence is merely colorable or is not significantly probative, the judge

27  may grant summary judgment. *Id*.

28       "In contract cases, summary judgment is appropriate only if the contract or

- 30 -

contract provision in question is unambiguous." *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981). A contract is rendered ambiguous if there is more than one plausible meaning or if it is reasonably subject to various interpretations. *Id.* However, mere disagreement by the parties of a contract's meaning does not render it ambiguous. *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989). Ambiguity is also not established if the alternate interpretation is a "strained" rather than a reasonable view. *Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1340 (9th Cir. 1989); *see also Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983) ("Preference must be given to reasonable interpretations as opposed to those that are unreasonable . . .").

"A written contract must be read as a whole and every part interpreted with reference to the whole." *Shakey's*, 704 F.2d at 434. Generally, the words of a contract must be given their plain and ordinary meaning. Restatement (Second) of Contracts § 202(3) cmt. e (1981). In some cases, however, words which are used in an industrial setting should be given the definition accorded to them by the industry in which they are being used. *Pacific Portland Cement Co. v. Food Machinery & Chemical Corp.*, 178 F.2d 541, 552 (9th Cir. 1949).

Further, in interpreting a contract the Court must determine whether or not considering extrinsic evidence is appropriate at the summary judgment stage. Interpreting the 1969 Lease is a matter of federal substantive law because "[f]ederal law controls the interpretation of a contract. . . . entered into pursuant to authority conferred by federal statute and, ultimately the Constitution. *United States v. Seckinger*, 397 U.S. 203, 209-10 (1970). Section 39 of the 1969 Lease says that the lease was entered into subject to the existing applicable regulations of the Department of the Interior contained in title 25 of the Code of Federal Regulations, which are codified in relevant part at 25 U.S.C. § 415. (Doc. 5 Ex. 3 at 34-35). This statute provides for the Secretary of Interior's approval of Indian leases. *See* 25 U.S.C. § 415. Accordingly, federal law governs here.

"For guidance, [the Court] may look to general principles for interpreting contracts." *Kennewick Irr. Dist.*, 880 F.2d at 1032 (quoting *Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir.), cert. denied, 464 U.S. 892 (1983)).  Under traditional contract principles, extrinsic evidence is inadmissible to interpret, vary or add to the terms of an unambiguous integrated written instrument.  *Trident Center v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 568 (9th Cir. 1988).  The question for the Court then is whether the terms of the 1969 Lease are unambiguous.

In this case, both of the parties have competing interpretations of what the 1969 Lease says.  Section 16 of the 1969 Lease reads in its entirety:

> 16.  <u>Operation of Navajo Generation Station.</u>  The Tribe covenants that, other than as expressly set out in this Lease, it will not directly or indirectly regulate or attempt to regulate the Lessees in the construction, maintenance or operation of the Navajo Generation Station and the transmission systems of the Lessees, or the construction, maintenance or operation of the fuel transportation system of the Lessees or the fuel Transporter.  This covenant shall not be deemed a waiver of whatever rights the Tribe may have to regulate retail distribution of electricity on the Reservation Lands.  Nothing herein shall convey to the Lessees, or any of them, any rights to engage in retail distribution of electricity on Reservation Lands.

(Doc. 5 Ex. 1 at 9-10).  The operative words, "other than as expressly set out in this Lease," automatically incorporate other provisions of the 1969 Lease into interpreting this clause.  In section 18 the parties agreed that:

> 18.  <u>Employment of Navajos.</u>  Lessees agree to give preference in employment to qualified local Navajos, it being understood that "local Navajos" means members of the Navajo Tribe living on the land within the jurisdiction of the Navajo Tribe. . . .

(Doc. 5 Ex. 1 at 10).  The parties do not argue that any other parts of the 1969 Lease affect the meaning of section 16 with respect to this case.

The central issue is the interpretation of the word "operation" and whether it

encompasses employment policies.  Plaintiffs argue that the language of section 16, "other than as expressly set out in this Lease, [the Tribe] will not directly or indirectly regulate or attempt to regulate the Lessees in the . . . operation of [NGS]," explicitly waives Defendants' authority to regulate employment practices at NGS.  (Doc. 162 at 17); (Doc. 175 at 23-24).  Defendants argue that section 16 does not waive the tribe's authority and that section 18 confirms that section 16 was not intended to be a waiver of the tribe's right to regulate employment because the parties separately considered and negotiated employment issues in section 18.  (Doc. 165 at 16); (Doc. 181 at 7).  Consequently, the parties' arguments center on the 1969 Lease itself.

The only reference by either party to evidence beyond the 1969 Lease is when Defendants argue in their Response that SRP's actions, taken eighteen years after the 1969 Lease was signed, proves that the NPEA specifies what section 18 means.  (Doc. 165 at 16-17).  The Court finds that the lease is clear and unambiguous in its terms.  Thus, under the parol evidence rule, Defendants may not introduce evidence to contradict plain and unambiguous terms.  Even if the Court were to consider parol evidence to interpret the terms, the extrinsic evidence here has no bearing on whether section 16 was intended in 1969 to include employment policies at NGS.[2]

---

[2]     In 1986, the ONLR filed a separate complaint than the one in this case with the NNLC against SRP for violating provisions of the NPEA.  (Doc. 168-1 Ex. 1 at 10).  The case was settled between the parties.  (*Id.*)

As part of that settlement, SRP developed the Navajo Generating Station Preference Plan (the "Plan").  (Doc. 5-6 Ex. 3).  The stated purpose of the Plan was to "clarify and delineate [SRP's] Affirmative Action Program for [NGS] and specifically the procedures for giving preference in employment to Indians."  (*Id.* at 4).  The Plan lays out how SRP will specifically give preference to Navajo members for skilled and unskilled positions.  The Plan makes no reference to the 1969 Lease or any provisions of the lease, makes no reference to how SRP handled employment matters with Navajos prior to 1986, nor does the Plan make any reference to the NPEA.

Defendants, however, claim the Plan proves that the parties agree that the NPEA, and not the Plan, defines what section 18 means and that SRP's actions (i.e. developing the Plan) demonstrate that section 18 has force and meaning.  (Doc. 162 at 16-17).

The Court finds this evidence and Defendants' argument is irrelevant to the

While both parties contend that the word "operation" means different things, this does not automatically make the word "operation" ambiguous and foreclose a determination of summary judgment. *See Kennewick Irr. Dist.*, 880 F.2d at 1032 ("mere disagreement by the parties of a contract's meaning does not render it ambiguous.").  The Court finds the meaning of the term "operation" is unmistakably clear by considering the contract as a whole.  Therefore, the interpretation of the terms of the 1969 Lease is a question of law and summary judgment is appropriate.

### ii.    The Term "Operation" Unmistakably Included Employment Policies

The 1969 Lease waived the Navajo Nation's sovereign power in unambiguous and unmistakable terms.  In section 16 of the 1969 Lease, it reads,

> The Tribe covenants that, other than as expressly set out in this Lease, it will not directly or indirectly regulate or attempt to regulate the Lessees in the construction, maintenance or operation of the Navajo Generation Station and the transmission systems of the Lessees, or the construction, maintenance or operation of the fuel transportation system of the Lessees or the fuel Transporter.

In considering the 1969 Lease on its face, with no explanation to the contrary, the Court would read the term "operation" and understand it to mean how NGS is run, or operated.  The Court's initial interpretation of this term is supported by the common definition of

---

ultimate issue.  Even if the Court were to consider this extrinsic evidence for its bearing on the 1969 Lease it would only support a contention that the parties subsequently agreed to implementation of the NPEA.  The issue here for considering whether summary judgment is warranted is whether the Navajo Nation unmistakably waived its sovereign authority in 1969—specifically whether the term "operation" includes employment policies.  The issue is not whether the parties agreed eighteen years after the lease was signed that the NPEA defines what section 18 means.  Even if it were considered, this extrinsic evidence does not create a genuine issue of material fact at the summary judgment stage.  Accordingly, the Court need only look to the four corners of the 1969 Lease to determine that it unambiguously waives the tribe's sovereign authority and therefore interpretation of the lease is a question of law determinable on summary judgment.

the word "operation."   According to the Oxford English Dictionary the primary definitions of "operation" are "the exertion of force or influence; working, activity; a manner of working, *the way in which a thing works*."   *Operation Definition*, OED.com, http://www.oed.com/view/Entry/131749?redirectedFrom=operation (last visited Dec. 21, 2012) (emphasis added).   The Court finds the "way in which [NGS] works" inherently includes how people are hired to work, to run, to exert influence over, and to operate NGS.  *See id*.  How people are chosen to work, run, or operate NGS, necessarily includes employment policies governing these people.

Defendants' arguments attempt to change this unambiguous meaning of the word operation.   Defendants argue that because the parties separately considered and negotiated employment issues and SRP agreed to give employment preferences to Navajos in section 18, this confirms that section 16 was not intended to include the tribe's right to regulate employment.  (Doc. 165 at 16); (Doc. 181 at 7).   The Court does not agree with this argument.

The clear words of section 16—"other than as expressly set out in this Lease"— makes Defendants' argument, that employment was separately discussed, actually support the conclusion that section 16 included employment.  By making their argument, Defendants inherently admit that section 16 would include employment if section 18 did not exist because of the words "other than as expressly set out."   In other words, Defendants are essentially arguing that because section 18 separately addresses employment, the subject of employment is not included in or is taken out of the ambit of section 16.   If section 16 inherently includes employment, separately addressing employment policies in section 18 does not logically remove all employment policies from the broad term "operation" as used in section 16.  To the contrary, the fact that detailed employment policies are "expressly set out in [the] Lease" convinces the Court that the Navajo Nation intended to relinquish power to regulate employment in section 16 except as expressed in section 18.

Defendants also contend that if section 16 was meant to include employment, and

- 35 -

the parties agreed that SRP would give employment preference to Navajos, that the employment preference clause would have been included in section 16.  (Doc. 165 at 16).  The Court does not agree with this conclusory statement.

Existence of the employment preference clause in section 18 does not indicate intent to maintain sovereign power to regulate employment.  The employment preference clause merely shows that this was an important issue to the parties and that the parties wished to memorialize their agreement on paper.  The parties could have done that anywhere in the contract, but chose to do it in a separate section.  If anything, again, by putting it in a separate section it shows that the tribe intended to surrender their sovereign power in section 16 except as expressed in section 18.   Accordingly, section 16 unmistakably included employment under the scope of the term "operation."

Finally, Defendants argue that Plaintiffs' reliance on the court's interpretation of the contract language in *Aspaas* actually proves the 1969 Lease did not waive the tribe's sovereign authority because of the differences between the two leases.  (Doc. 165 at 17-18).  Defendants contend this Court should find the differences dispositive here.  (Doc. 181 at 8).

In *Aspaas*, the district court held and the Ninth Circuit Court of Appeals affirmed, that the Navajo Nation had unmistakably waived its sovereign power to regulate employment at the FCPP by the terms of the lease signed in 1960, and the two subsequent amendments to that lease signed in 1966 and 1985.  *Aspaas*, 77 F.3d at 1131-1132, 1135.  The 1960 lease contained a non-regulation clause that was not materially changed in either amendment and read:

> The Tribe covenants that, other than as expressly set out in this agreement, it will not directly or indirectly regulate or attempt to regulate the Company or the construction, maintenance or operation of the power plant and transmission system by the Company, or its rates, charges, operating practices, procedures, safety rules, or other policies or practices.

*Id*. at 1130.  The 1960 lease also included a general dispute resolution process similar to

the dispute resolution process of section 25 in the 1969 Lease involving the Secretary of the Interior. *Id.* The 1960 lease and both amendments also included an employment preference clause similar to section 18 of the 1969 Lease in this case.[3] Further, the 1985 amendment incorporated a letter agreement that explained the employment preference clause in more detail and provided a minitrial mechanism in the event of a dispute arising out of the letter agreement. *Id.* at 1131 n.4.

The Court of Appeals held that these lease documents, in particular the non-regulation clause and the letter agreement, demonstrated an unmistakable waiver by the Navajo Nation. *Id.* at 1135. The Court of Appeals also noted that the minitrial mechanism in the letter agreement for disputes arising from the employment preference clause was "[o]f particular significance" in the holding because the record showed that the tribe refused to abide by this mechanism and adopted the NPEA in order to bypass it. *Id.*

In this case, it is undisputed that the 1969 Lease contains no letter agreement further explaining the meaning of the employment preference clause (§ 18) and no separate minitrial exists to adjudicate disputes arising from section 18. Further, section 16 clearly differs from the non-regulation clause in the 1960 lease in *Aspaas*. Specifically, the 1960 lease in *Aspaas* included the conspicuous language that the tribe will not regulate the operation of the power plant "or its rates, charges, operating practices, procedures, safety rules, or other policies or practices." No such language about "policies or practices" appears in the 1969 Lease in this case.

---

[3] The 1960 lease included section 19 that said "[APS] agrees that in selecting applicants for employment on the Reservation, it will employ Navajo Indians when available in all positions for which they are qualified in the judgment of the Company, and will pay prevailing wages to such Navajo employees." *Aspaas*, 77 F.3d at 1130.

The 1966 amendment reiterated this "Navajo preference" provision. *Id.*

The 1985 amendment included section 25, which said "Lessee shall provide preference in employment to Indians living within or near the Reservation in connection with the construction and operation of the facilities contemplated in this Supplemental Lease." *Id.* at 1130 n.2.

These differences, however, are not dispositive in the Court's view.   On the spectrum of how clear contractual language waives the Navajo Nation's sovereign right to regulate employment at a non-Indian employer, the lease in *Aspaas* undoubtedly makes the tribe's waiver clearer than the 1969 Lease does.   However, the test for whether the tribe waived its sovereign power in this case is not whether the 1969 Lease meets the standard set by *Aspaas*, the test is whether the 1969 Lease on its own unmistakably waives the tribe's authority.   As explained above, the Court finds, standing alone the 1969 Lease unmistakably does include such waiver.

Defendants have not offered evidence or a convincing argument that changes the unambiguous meaning of the word "operation" as it is used in section 16.   Without something more, the Court declines to give new meaning to what is on its face clear.   The Supreme Court requires that the language waiving a sovereign right be unmistakable.   *See Merrion*, 455 U.S. at 148.   The Court acknowledges that the language of the non-regulation clause does not include the words employment, practices, or policies.   However, the non-regulation clause does include the Navajo Nation unmistakably waiving their right to regulate the "operation" of NGS.   The term "operation" is necessarily broad because, by its common definition, it includes how NGS is run.   If employment policies are not included within this term, and were not unmistakably waived, the Court would be challenged to identify what sovereign right the tribe did unmistakably waive with the term "operation."   The non-regulation clause would be effectively meaningless.   Accordingly, with no language explaining otherwise, operating a power plant unmistakably contemplates and includes the people required to do the operating.

Therefore, Defendants generally have the sovereign power to regulate the employment activities of nonmembers engaged in consensual relationships with the tribe. In this case, however, Defendants expressly waived their sovereign power to regulate the employment policies of SRP by waiving their right to regulate the operation of NGS.

**C.     PERMANENT INJUNCTIVE RELIEF**

- 38 -

Plaintiffs have also requested that the Court grant the permanent injunction requested in their Complaint. (Doc. 162 at 17). In order to be granted a permanent injunction the Supreme Court has said a plaintiff must satisfy four factors. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (ebay).

Given the Court's finding that the Navajo Nation waived its right to enforce the NPEA at NGS, the Court also finds Plaintiffs are entitled to permanent injunctive relief for the following reasons.

Plaintiffs have shown that they suffer irreparable harm by being subjected to the NPEA. Plaintiffs have agreed to give preference in employment to Navajos by the terms of section 18. Further, as discussed above in footnote 2, Plaintiffs developed and agreed to the Plan in 1986, establishing further clarity for what Plaintiffs' obligations are in terms of Navajo preference in employment. Enforcement of the NPEA goes beyond the bargained for agreement between the parties and subjects Plaintiffs to irreparable harm in the absence of injunctive relief.

Defendants claim Plaintiffs suffer no harm because "[e]nforcement of NPEA at NGS would not change the status quo, except maybe to force SRP to live by the commitments it has already made." (Doc. 165 at 20). If this were true, there would be no need for this suit. Defendants are limited now to enforcing the bargained for agreement between the parties, i.e. the Plan. If the NPEA is no different than the Plan, Defendants would have no reason to pursue four years of litigation to enforce the NPEA instead of just enforcing the Plan.

Due to the circumstances and the ongoing attempts to enforce the NPEA by the Navajo Nation, Plaintiffs have shown that equitable relief is justified.

The balance of hardships also tips in favor of Plaintiffs because of the nature of operating a power generating station like NGS.  Plaintiffs need to be able to freely determine who the most qualified candidates are and put the most qualified people in critical positions.  Further, Navajo employees are already protected by the Plan, state, and federal employment law.  Accordingly, the balance tips in favor of Plaintiffs.

Finally, the public interest is served by upholding the unambiguous terms of a contract.  The terms at issue here do not deny any rights to Navajo employees.  Consequently, the Court finds the public interest is served by granting a permanent injunction.

Therefore, because Plaintiffs have satisfied the factors delineated in *ebay*, Plaintiffs are entitled to permanent injunctive relief and the Court grants Plaintiffs' request for a permanent injunction.

V.      **CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** denying Defendants' Motion to Dismiss Parties (Doc. 169).

**IT IS FURTHER ORDERED** granting Plaintiffs' Motion for Summary Judgment (Doc. 162).

**IT IS FINALLY ORDERED** denying Defendants' Cross Motion for Summary Judgment (Doc. 167).

//

//

//

//

//

//

//

//

//

- 40 -

1    The Clerk of the Court shall enter declaratory judgment for Plaintiffs Salt River

2    Project Agricultural Improvement and Power District, a municipal corporation and

3    political subdivision of the State of Arizona, and Headwaters Resources, Inc., a Utah

4    corporation, against Defendants Reynold R. Lee, Casey Watchman, Woody Lee, Peterson

5    Yazzie, Evelyn Meadows, Honorable Herb Yazzie, Honorable Louise G. Grant,

6    Honorable Eleanor Shirley, Leonard Thinn and Sarah Gonnie: the Court hereby declares

7    that Defendants (1) may not apply the NPEA to or enforce it against SRP, the other

8    Participants and/or their contractors (including Headwaters) at NGS; and (2) may not

9    regulate, through tribal proceeding or otherwise, except as provided by the 1969 Lease,

10   the operation of NGS by SRP, the other Participants and/or their contractors (including

11   Headwaters) related to employment matters.  Permanent injunction to follow.

12   Dated this 28th day of January, 2013.

_____
James A. Teilborg
United States District Judge

- 41 -